UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JODY A. ROBINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cv-30196-KAR |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
REVERSAL OF THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION TO
AFFIRM THE COMMISSIONER'S DECISION
(Docket Nos. 16 & 19)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Jody A. Robins ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title

II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.*, and Supplemental Security

Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Plaintiff applied for DIB

and SSI on October 2, 2015, alleging a January 1, 2014 onset of disability due to attention deficit

hyperactivity disorder ("ADHD"), dyslexia, and bilateral hip dislocation (Administrative Record

"A.R." at 14, 238, 242, 258, 262).  After a hearing, the Administrative Law Judge ("ALJ") found

that Plaintiff was not disabled from January 1, 2014 through October 11, 2017, the date of the

decision, and denied her application for DIB and SSI (A.R. at 14-28).  The Appeals Council

denied review on October 15, 2018 (A.R. at 1-8) and, thus, Plaintiff is entitled to judicial review. *See Smith v. Berryhill,* 139 S. Ct. 1765, 1772 (2019).

Plaintiff contends that the ALJ erred by (1) failing to find that she had an impairment or combination of impairments that met or medically equaled the severity of listed impairment 1.02A; (2) determining that she had the residual functional capacity ("RFC") to perform light work with additional limitations; and (3) failing to afford sufficient weight to Plaintiff's statements concerning the severity of her symptoms. Pending before this court are Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 16), and the Commissioner's motion for an order affirming his decision (Dkt. No. 19). The parties have consented to this court's jurisdiction (Dkt. No. 15). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons stated below, the court will grant the Commissioner's motion for an order affirming the decision and deny Plaintiff's motion.

II.    FACTUAL BACKGROUND

A.    Plaintiff's Educational Background and Work History

Plaintiff was 39 years old on the date of the September 13, 2017 hearing (A.R. at 35, 87). She lived with her fiancé and her two children ages six and three (A.R. at 72). Plaintiff graduated from high school and completed a computer and electronics program offered by DeVry University in New Jersey (A.R. at 53-54). In 2010, Plaintiff lived in Vermont and began working as a caretaker for her mother who had suffered a stroke (A.R. at 39-40). Plaintiff folded laundry, transported her mother to medical appointments, and shopped for food (A.R. at 40). From 2012 until late 2015 or early 2016, Plaintiff was paid to care for her mother in their home in Massachusetts (A.R. at 40-41, 43).

B.    Plaintiff's Medical History

1.    Plaintiff's Physical Condition

On December 5, 2014, Plaintiff visited her primary care physician ("PCP"), Shahnaz Rashid, M.D., at Berkshire Health Systems complaining of swelling in her right knee and pain of 5 on a scale of 1 to 10, which sometimes radiated to her right thigh and was aggravated by movement. Her range of motion was full on extension, 115 degrees on flexion, and the drawer test and ligaments test were negative. Palpation of Plaintiff's back showed "mild" tenderness of the lower lumbar spine (A.R. at 635). To treat Plaintiff's right knee, Dr. Rashid prescribed Tramadol HCL, ordered an x-ray, and referred Plaintiff to Rheumatology Professional Services ("RPS") (A.R. at 634-36).

The December 5, 2014 x-ray of Plaintiff's right knee showed a small suprapatellar effusion and mild edema within the Hoffa fat pad. There was no acute fracture, dislocation, or focal osseous lesion. The joint spaces were preserved (A.R. at 524). Dr. Rashid noted that the x-ray showed "no arthritic change" (A.R. at 626).

On December 6, 2014, Plaintiff visited the Berkshire Medical Center ("BMC") Emergency Department to have fluid drained from her right knee to relieve the pain and swelling. Her right knee was swollen but had "good range of motion." There was no erythema, warmth, or deformity, and the ligaments were stable. Plaintiff was ambulatory with a "steady gait." The emergency department physician ordered a cane and a "closed patella knee sleeve," prescribed prednisone and Motrin, and recommended that she follow up with Berkshire Orthopaedics within a week (A.R. at 509, 515-18, 1364-66).

The December 19, 2014 record of Plaintiff's visit to Dr. Rashid indicates that medication had improved Plaintiff's right knee pain and chronic back pain. The physician observed mild tenderness over Plaintiff's bilateral hips and right knee. Movement on the pole of both hips was

"slightly restricted." The range of motion of Plaintiff's spine was also "slightly restricted," but there was no spine tenderness or paravertebral muscle spasm. Plaintiff was limping (A.R. at 631-33).

On February 5, 2015, Plaintiff presented to Lauren Dudley, M.D., at RPS complaining of a painful and swollen right knee and pain in her low back. Plaintiff reported that she had not taken medication for her back or seen an orthopedist for two years. Because Plaintiff had not been examined by a rheumatologist in 2005 when she experienced stiffness in her hips and back, Dr. Dudley was skeptical of Plaintiff's representation that Dartmouth Hitchcock Medical Center had diagnosed her with rheumatoid arthritis at that time. Upon examination, Plaintiff had full range of motion in her back, severely limited range of motion and severe pain in her left hip, and moderately limited range of motion and "mild" pain in her right hip. Dr. Dudley aspirated Plaintiff's right knee and injected bupivacaine and Kenalog, which alleviated the pain (A.R. at 421-25).

Plaintiff consulted James Harding, M.D., of Berkshire Orthopaedic Associates on February 20, 2015 concerning the condition of her left hip. Plaintiff described the constant and severe pain over her greater trochanter and in her groin, which radiated to her anterior and posterior thigh. The pain increased when she walked, rose from a seated position, and used stairs. Dr. Harding noted that Plaintiff was "full weightbearing" and had an antalgic gait. Upon examination, there was no tenderness over Plaintiff's sacrum, mild tenderness over her sacroiliac joints and inguinal region, and moderate tenderness over the greater trochanter. Plaintiff's left hip showed limited active range of motion with 100 degrees hip flexion, limited passive range of motion with 15 degrees hip flexion internal rotation, and 40 degrees hip flexion external rotation. An examination of Plaintiff's left knee showed normal ligaments, full and painless range of

motion, no gross palpable tenderness, and no obvious deformities (A.R. at 469-70). An x-ray of

Plaintiff's left hip indicated that arthritis had progressed since 2012. Dr. Harding administered

an injection to Plaintiff's left hip on March 6, 2015 (A.R. at 523).

On March 31, 2015, Steven Nguyen, M.D., of the Pain, Diagnosis & Treatment Center of

BMC ("Pain Center") treated the "severe" (9/10) pain in Plaintiff's left hip and bilateral low back

and buttocks. According to Plaintiff, walking, bending, lifting, and direct pressure exacerbated

the pain (A.R. at 572). Plaintiff's gait was antalgic and she favored her right side. Her left

iliotibial band ("ITB") was tender to palpation, as were her bilateral paraspinal interspinous

("PSIS"), gluteus muscles, lumbar paraspinal, and lumbar facets. Bilateral straight leg raises

were positive. Dr. Nguyen prescribed oxycodone and Meloxicam, recommended a bilateral

sacroiliac joint injection, which had afforded relief in the past, and ordered an MRI of her lumbar

spine (A.R. at 574-75).

The April 3, 2015 MRI of Plaintiff's lumbar spine showed a "tiny central disc protrusion

with annular fissure [at L5-S1] which contact[ed] but d[id] not significantly deform the ventral

margin of the thecal sac." There was no spinal canal or nerve root compromise. There was disc

uncovering at S1-S2 due to anterolisthesis, but no disc herniation, spinal canal, or foraminal

compromise. The radiologist's impression was a transitional anatomy of the lumbosacral

junction with lumbarization of S1,[1] left sided S1 spondylolysis, and mild levoconvex scoliosis of

the lumbar spine (A.R. at 521-22).

---

[1]"Lumbarization" is "a condition in which the first segment of the sacrum is not fused with the
second, so that there is one additional articulated vertebra and the sacrum consists of only four
segments." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1076 (32d ed. 2012).

Plaintiff received a bilateral SI joint injection on April 6, 2015 (A.R. at 501, 592-93). On April 29, 2015, Plaintiff reported a fifty percent decrease in her back and buttock pain after the injection (A.R. at 567-68).

On June 26, 2015, Plaintiff's most severe pain was in her left hip. She told Dr. Nguyen that an orthopedic surgeon recommended a left hip replacement (A.R. at 564-67).

The record of Plaintiff's May 11, 2015 visit to Dr. Dudley at RPS indicates that Plaintiff's left hip "still really bother[ed] her." The range of motion of her left hip was "severely limited" and the range of motion of her right hip was "moderately limited" with "mild pain." Her right knee was painful and swollen. Plaintiff stated that, after she received the injection in February, her knee swelled once after she went down some stairs, got stuck in a position, then popped. Dr. Dudley opined that Plaintiff's knee condition was "mechanical" (A.R. at 417-20).

On July 9, 2015 and August 25, 2015, Dr. Rashid noted that Plaintiff's right knee pain was "stable" (A.R. at 623, 626).

During Plaintiff's August 18, 2015 visit to Dr. Dudley at RPS, Plaintiff reported that her knee felt good. She only had pain in her hips and in her back. The back pain was worse in the morning and evening. Dr. Dudley observed that Plaintiff had full range of motion in her knees. Plaintiff's records from Dartmouth Hitchcock did not mention rheumatoid or inflammatory arthritis, just chronic pain, hip dysplasia, and spondylolisthesis (A.R. at 412-16). An x-ray of Plaintiff's bilateral sacroiliac joints on that date showed that the joint space and margins were normal and there was no bony or joint erosion (A.R. at 430). Dr. Dudley opined that Plaintiff's back pain "may be mechanical due to malpositioning" caused by her hip pain (A.R. at 415).

On August 31, 2015, Plaintiff complained to Glenda Boykin, PA-C of the Pain Center of "sharp, achy pain in her lower back, and constant sharp, burning, achy pain in her left buttock

and groin."  She described the pain as 10 on a scale of 1 to 10 and stated that it was exacerbated

by lying down, bending, standing, and walking.  Rest, injections, and medication provided relief

(A.R. at 561).  Ms. Boykin observed that Plaintiff's gait was "somewhat antalgic, but it [was]

narrow-based and stable without the use of an assistive device."  Upon examination, there was no

pain on palpation over the spinous processes of Plaintiff's thoracic spine and paraspinally in that

area.  Plaintiff experienced mild to moderate pain on palpation over the spinous processes of her

lumbar spine from about L4-S1, with mild to moderate pain on palpation paraspinally in that area

and over the upper pole of each buttock.  The Fortin finger test and Gillette's test were positive

bilaterally.  A "log roll" of her left leg produced pain in her left groin and buttock.  Straight leg

raises were to about 80 degrees bilaterally.  Gaenslen's and Patrick's tests produced a "fair

amount" of bilateral groin and bilateral buttock pain.[2]  The range of motion of her lumbar spine

was limited in all directions due to pain in her lower back and buttocks.  Plaintiff had decreased

range of motion in both hips, with the left being more restricted than the right (A.R. at 562-63).

Plaintiff visited David Olds, Jr., P.A. and Kevin Mitts, M.D., at Berkshire Orthopaedic

Associates on September 11, 2015 for a follow-up consultation concerning her left hip.  The

---

[2] The "Fortin finger test is used as an indicator of low back pain and SI joint dysfunction."  *Ward v. Saul*, Civil Action No. 2:18cv00002, 2019 WL 4262518, at *9 n.12 (W.D. Va. Aug. 22, 2019), *rec. adopted,* No. 2:18cv00002, 2019 WL 4261124 (W.D. Va. Sept. 9, 2019).  "Gillette's test is used to access abnormal movement of the sacroiliac joint."  *Ahmad v. Astrue*, No. 4:11-CV-01342, 2012 WL 5463676, at *6 n.25 (M.D. Pa. Nov. 8, 2012), *aff'd sub nom. Ahmad v. Comm'r of Soc. Sec.*, 531 F. App'x 275 (3d Cir. 2013).  "Gaenslen's test detects musculoskeletal abnormalities of the sacroiliac joint."  *Allen v. Astrue*, No. C07-4004-PAZ, 2008 WL 245992, at *3 n.2 (N.D. Iowa Jan. 28, 2008).  "'The Patrick's Test is a physical examination test to determine the presence of sacroiliac joint dysfunction in patients with lower back pain.'"  *Scharf v. Comm'r of Soc. Sec.*, Case No. 6:13-cv-391-Orl-KRS, 2014 WL 12629966, at *2 n.2 (M.D. Fla. Mar. 24, 2014).

results of the examination of Plaintiff's left hip and knee were similar to those obtained in February 2015. An x-ray of the left hip showed severe left femoral acetabular joint space narrowing with superior bony opposition. After a discussion, Plaintiff elected to proceed with a total left hip replacement (A.R. at 471-72).

On October 6, 2015, Plaintiff presented to Marshall Katzen, M.D., at UMass Memorial HealthCare's Arthritis and Joint Replacement Center ("UMass"). Plaintiff reported that she was unable to work due to the stiffness in her left hip, and the pain, which was 10 on a scale of 1 to 10. Dr. Katzen's examination revealed the Plaintiff's left leg was an inch shorter than her right leg and tended to rest in external rotation. Plaintiff's left hip exhibited flexion to 50, internal rotation of 0, external rotation to 20, and abduction to 25. Her right hip revealed flexion to 115, internal rotation to 30, and external rotation to 40. The x-rays performed on that date showed "[s]evere degenerative arthritis of the left hip joint . . ." and "minimal degenerative changes" to the right hip, pubic symphysis, and the lower lumbar spine and facets. The SI joints were normal (A.R. at 474-80).

The October 9, 2015 MRI of Plaintiff's left hip showed "congenital appearing left hip dysplasia with changes of marked secondary osteoarthritis [and] [m]ild left iliopsoas bursitis." The right hip joint appeared unremarkable and the sacroiliac joints were within normal limits (A.R. at 494).

On October 15, 2015, Andrew Demaggio, M.D. performed a bilateral SI joint injection for relief of Plaintiff's sacroiliitis. A fluoroscopy showed degenerative changes (A.R. at 482, 557, 559, 589). Dr. Demaggio injected Plaintiff's left hip on October 29, 2015. Degenerative changes were observed on the fluoroscopy (A.R. at 588).

During Plaintiff's October 30, 2015 visit to her PCP, she requested a prescription for a "quad cane" for her left hip pain (A.R. at 647-48).

The record of Plaintiff's January 6, 2016 visit to Dr. Demaggio at the Pain Center indicates that Plaintiff complained of "dull and aching" bilateral lower back pain that radiated into her left buttock. She assessed the pain as 10 on a 1 to 10 scale. She stated that walking exacerbated the pain, while rest, activity modification, and opioid analgesics relieved it. Plaintiff denied using Suboxone, which was identified as being present in her urine that was screened for illicit narcotics in accordance with her pain contract. Because Plaintiff violated the contract, oral opiates were discontinued. Dr. Demaggio noted that the most recent MRI of Plaintiff's back showed multilevel spondylosis, incidental scoliosis at 15 degrees, and transitional anatomy. He recommended that she receive a sacroiliac joint injection like the ones that had provided pain relief in the past, engage in a daily exercise program, and consider using conservative therapies, such as acupuncture and massage therapy, to replace opiates (A.R. at 645, 668-75, 692-95). Plaintiff received a bilateral sacroiliac joint injection on January 28, 2016 (A.R. at 699).

The record of Plaintiff's April 11, 2016 visit to Dr. Dudley at RPS indicates that Plaintiff had no pain in her right knee, her back "bothered her here and there" when she reclined, and her right hip was "achy here and there," but was not as painful as her left hip. Dr. Dudley noted that Plaintiff's knee condition had not recurred since she administered an injection. Dr. Dudley opined that Plaintiff's knee and back conditions were "mechanical issues due to abnormal gait from her severe" left hip condition. Dr. Dudley indicated that Plaintiff could return if the condition of her back and knee did not improve after her left hip replacement (A.R. at 904-07).

On April 18, 2016, Plaintiff told Dr. Katzen of UMass that she had been using a cane for more than one year and that the pain in her left hip was 8 on a scale of 1 to 10. Dr. Katzen

reviewed Plaintiff's x-rays of that date and noted that the x-rays of Plaintiff's right hip "looked good" (A.R. at 1197-1200).

Plaintiff underwent a total replacement of her left hip at UMass on June 7, 2016 (A.R. at 908-09). Thereafter, Plaintiff received skilled nursing care, physical therapy ("PT"), and occupational therapy ("OT") from the Berkshire Visiting Nurses Association ("VNA") (A.R. at 910-1189).

The record of Plaintiff's June 21, 2016 visit to Dr. Katzen notes that Plaintiff's pain level was 5/10 and her gait was good with the assistance of a walker. She was cleared to bear weight as tolerated and to use stairs (A.R. at 1205-06).

The VNA note of June 22, 2016 indicates that Plaintiff's lower back was "aching" and she assessed the pain as 3/10 (A.R. at 1043). She was able to climb the swimming pool ladder with supervision and did not complain of pain (A.R. at 1045). On June 30, 2016, the VNA indicated that Plaintiff's lower back pain was 2/10, was aggravated by prolonged standing, exertion, and movement, and was alleviated by postural changes, resting, sitting, and taking Tylenol (A.R. at 1079, 1081). She was discharged from skilled nursing care on that date, but received OT and PT services thereafter (A.R. at 1081).

When Plaintiff saw Dr. Rashid on July 1, 2016, she described her post-surgical pain in her left hip as 4 on a scale of 1 to 10 (A.R. at 1285). Dr. Rashid indicated that Plaintiff used a cane and described Plaintiff's gait as "antalgic but steady." There was no tenderness over her right hip, knees, or ankles (A.R. at 1287).

The VNA note of July 7, 2016 indicates that Plaintiff had no pain in her left hip and had an intermittent aching pain in her left anterior thigh, which she assessed as 3 on a scale of 1 to 10

(A.R. at 1096).  She walked 400 feet without an assistance device on an outdoor and uneven surface (A.R. at 1097-98).

Plaintiff returned to UMass for examination by Dr. Katzen on July 11, 2016.  Plaintiff reported that she was "doing well" and used a cane to walk, "but [did] not need it."  She could walk for ten minutes, walked with a "slight limp," and took stairs "one step at a time."  If she stood for a long period of time, she experienced a sharp pain that radiated into her femur.  She smoked marijuana to relieve pain.  Dr. Katzen gave her a prescription for six additional PT sessions (A.R. at 1207).

On July 12, 2016, the VNA physical therapist noted that Plaintiff reported that the pain in her left thigh had decreased (A.R. at 1106).  On July 15, 2016, Plaintiff indicated that her left interior thigh pain was 2/10 and was "controlled" (A.R. at 1121).

On July 28, 2016, Plaintiff reported that her left anterior thigh pain was 3/10, she was not taking pain medication, and the pain was "not stopping [her] from doing what [she] needed to do" (A.R. at 1142, 1153).  She was able to:  groom and dress her upper and lower body without assistance; bathe with use of devices; walk with a cane on the uneven and sloped grassy surfaces in her yard; walk independently without a cane on all other surfaces; negotiate stairs; and independently plan and prepare light meals (A.R. at 1174-77).  She was discharged from PT on that date (A.R. at 1153).

Dr. Katzen examined Plaintiff again on September 6, 2016.  Her pain was 4/10.  She reported that walking was "fine," but she experienced pain beginning at about 2:00 P.M. every day due to "chasing around her two children."  She walked with a "slight limp."  If she stood for more than ten minutes, the area from her hip to her knee throbbed.  She also complained of back pain.  She treated her pain by elevating her leg and taking Tylenol.  Dr. Katzen noted that

Plaintiff's left leg was still one inch shorter than her right leg and recommended a shoe lift for correction. The range of motion in her left hip went from 0 to 120, the internal rotation went to 30, the external rotation went to 35, and abduction went to 40. The "log rolling" was negative and there was no flexion contracture. Dr. Katzen recommended using Tylenol and ice for pain relief (A.R. at 1209-10).

When Plaintiff visited Dr. Katzen on October 18, 2016, she reported that, three weeks before, her knee had collapsed and she fell. Thereafter, she removed her shoe lift because she felt that it interfered with her balance. She took marijuana oil capsules four times a day for left leg pain, which she described as 7 on a scale of 1 to 10. Dr. Katzen noted that Plaintiff's gait was antalgic. An examination of Plaintiff's left hip revealed a negative straight leg raise, except for medial thigh pain. Hip flexion was to 110, internal rotation was to 20, and external rotation was to 30. The "log rolling" was negative. An x-ray of Plaintiff's left femur and hip showed no signs of fracture and an intact femur. Dr. Katzen diagnosed a left hip sprain and directed Plaintiff to use Advil, Tylenol, and marijuana for pain (A.R. at 1211-12).

The record of Plaintiff's November 16, 2016 visit to Dr. Rashid indicates that Plaintiff complained of "occasional tingling numbness of [her] bilateral hands and feet" and "[o]ccasional difficulty . . . walking due to hip osteoarthritis and low back pain." Plaintiff stated that her hip pain had improved after she underwent the total left hip replacement. She described the pain as "deep dull aches sometimes sharp, radiating down to the left hip, aggravated with bending, lifting, [and] prolonged sitting or standing." She was not taking any pain medication, but requested a referral to the Pain Center for an injection, which had relieved the pain in the past, and indicated she would try naproxen (A.R. at 1288). Upon examination of Plaintiff's cervical and thoracic spine, Dr. Rashid noted that there was no tenderness or paravertebral muscle spasm

or tenderness. There was mild to moderate tenderness over the L1-S1, "mild paravertebral muscle spasm over the lower lumbar region," and bilateral sacroiliac joint tenderness. Plaintiff's bilateral hips were not tender. Dr. Rashid assessed lumbar radiculopathy and "possible sacroiliitis" and referred Plaintiff to the Pain Center (A.R. at 1290-91).

On December 7, 2016, Plaintiff returned to the Pain Center for the first time since Dr. Demaggio administered the bilateral sacroiliac joint injection on January 28, 2016. Plaintiff reported that her back pain decreased by fifty percent for about eight weeks after the injection, then she "gradually" returned to baseline. During the December 7 visit, she complained of "constant sharp, burning, achy pain across her lower back and in her buttocks," which was 7-8 on a scale of 10. Bending, walking, lying down, and lifting exacerbated the pain. Injections, medication, and rest relieved it. She reported that she exercised by caring for her children. Upon examination, PA-C Boykin noted that Plaintiff's gait was "slightly antalgic," but it was "narrow-based and stable without the use of an assistive device." Plaintiff had mild to moderate pain on palpation over L4-S1, with mild pain on palpation paraspinally in that area on the right and mild to moderate pain on the left. There was mild to moderate pain on palpation over the upper pole of her buttocks, on the left more than on the right. The Fortin finger test, Gaenslen's test, and Patrick's test were positive bilaterally. A "log roll" of Plaintiff's legs produced some discomfort in her lower back and buttocks. The straight leg raise was about 45 degrees on the left and 60 degrees on the right due to the pain in her lower back and buttocks, but there was no pain, numbness, or tingling in either leg. Pain in her lower back limited the range of motion of her lumbar spine in all directions (A.R. at 1215-17). Plaintiff received a bilateral sacroiliac joint injection on December 20, 2016 (A.R. at 1424-25).

When Plaintiff visited Dr. Katzen at UMass on January 17, 2017, she reported that she was usually able to climb stairs "step over step" and could walk for fifteen minutes. Plaintiff indicated that her left hip and back pain was 6/10. Dr. Katzen assessed Plaintiff's gait and leg lengths as "good." Her left hip flexion was to 90, internal rotation was to 25, and external rotation was to 30. A "log roll" was negative. The x-ray of Plaintiff's left femur and hip showed no sign of fracture and good alignment. Dr. Katzen indicated that her pain would be treated "conservatively" for the next six months and she should return in one year or sooner if needed (A.R. at 1213-14).

On January 18, 2017, Plaintiff visited the Pain Center and reported that the injection she received on December 7, 2016 relieved her lower back and buttock pain by about fifty percent (about 5 on a scale of 1 to 10), she was "happy with the results," and she experienced less pain while performing her daily activities. The "sharp, achy" pain increased if she sat, stood, or carried items. Rest, medication, and injections provided relief (A.R. at 1218-19).

On February 16, 2017, Plaintiff told Dr. Rashid that her low back pain was "much better" after she received the bilateral sacroiliac joint injection, that she had no back pain, and that her pain was controlled with naproxen, Tizanidine, and lidocaine "when necessary." Her gait was normal and she moved her arms and legs without discomfort (A.R. at 1292, 1294).

Plaintiff received a bilateral sacroiliac joint injection on June 20, 2017 (A.R. at 1426-31).

2. Plaintiff's Mental Condition

On March 31, 2015, Plaintiff reported that she was unable to concentrate and requested a prescription for Adderall from Dr. Rashid. Plaintiff indicated that her ADHD symptoms had been effectively managed with Adderall since she was eight years old, but she stopped taking it when she got pregnant. She wanted to resume the medication. Dr. Rashid prescribed Strattera

14

and referred Plaintiff for a neuropsychiatric evaluation to determine whether and to what degree she had attention and cognitive deficits (A.R. at 628-30, 787).

Barbara A. Dunne, Ed.D., a clinical neuropsychologist with Berkshire Memory Services, evaluated Plaintiff's memory and cognition on July 1, 2015. Based on the results of a battery of tests, Plaintiff's clinical presentation, and her anecdotal history of ADHD and dyslexia, Dr. Dunne determined that Plaintiff met the diagnostic criteria for the predominantly inattentive type of ADHD. Dr. Dunne indicated that Plaintiff's symptoms were "quite significant" and were exacerbated by her history of dyslexia. In view of Plaintiff's report that Adderall had been effective in managing her symptoms but Strattera was not, Dr. Dunne recommended that she review stimulant medication options with Dr. Rashid (A.R. at 787-88).

The record of Plaintiff's July 9, 2015 visit to Dr. Rashid indicates that Plaintiff did not appear anxious or depressed and did not report depression or anxiety (A.R. at 624, 626). On August 25, 2015, Plaintiff's depression and anxiety were "stable." She reported that she was no longer taking Strattera because it was "not helping" (A.R. at 621, 623).

Plaintiff sought counseling from the Brien Center to reduce her anxiety and to learn to manage "personal stressors and severe medical issues." The Brien Center records contain an assessment conducted by Carol King-Reed on December 6, 2015. The mental status exam indicated that Plaintiff's speech, perception, thought content, intellectual functioning, orientation, insight, and judgment were within normal limits. She was hyperactive, fearful, apprehensive, and anxious, and her immediate recall and recent memory were impaired. Plaintiff indicated that caring for her family and her pending hip replacement were major sources of anxiety and that her chronic pain and dyslexia exacerbated her difficulty concentrating. Plaintiff also reported a sleep

disturbance that was related to her medical condition. Ms. King-Reed diagnosed ADHD and anxiety NOS (A.R. at 438-46, 456-64, 793-98).

On June 14, 2016, the VNA staff clinician who assessed Plaintiff's cognitive functioning recorded that she had no memory deficits. She was able to focus, shift her attention, and comprehend and recall task directions independently. Plaintiff indicated that she had not experienced anxiety or depression in the last two weeks (A.R. at 943-45). On July 28, 2016, in discharging Plaintiff from PT services, the VNA therapist noted that Plaintiff was able to express complex ideas, feelings, and needs clearly, completely, and easily in all situations without an observable impairment (A.R. at 1153, 1168).

On February 16, 2017, Plaintiff told Dr. Rashid that her ADHD, dyslexia, and sleep pattern disturbance had improved (A.R. at 1294).

C.       State Agency Consultants' Opinions

        1.       December 2015

On December 10, 2015, R. McFee, D.O., assessed Plaintiff's physical RFC based on a review of her records. Dr. McFee opined that Plaintiff could: lift twenty pounds occasionally and ten pounds frequently; stand and/or walk "slightly less" than two hours with normal breaks; sit for "[a]bout" six hours during an eight-hour workday with normal breaks; never climb ladders, ropes, and scaffolds; and occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Her ability to push and pull with both lower extremities was limited. In addition, she would have to avoid concentrated exposure to extreme cold, extreme heat, and vibrations and could never be exposed to hazards, such as machinery and heights (A.R. at 95-97). Dr. McFee determined that Plaintiff was not disabled (A.R. at 99).

Joseph A. Whitehorn, Ph.D., reviewed Plaintiff's records, including the neuropsychological evaluation and the Brien Center treatment records.  Dr. Whitehorn considered Plaintiff's ADHD and anxiety disorder and found that Plaintiff had moderate restrictions in activities of daily living, mild difficulties maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation (A.R. at 88, 92, 93-94).  Specifically, Dr. Whitehorn opined that:  Plaintiff's ability to understand and remember detailed instructions was moderately limited, but her memory and understanding were adequate for the performance of simple tasks.  In addition, her ability to carry out detailed instructions was moderately limited as was her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting.  According to Dr. Whitehorn, notwithstanding her limitations, Plaintiff was able to sustain pace and focus on simple tasks for two hours and could handle changes in simple work routines (A.R. at 97-98) .

       2.       May 2016

Lucinda Wheelock, M.D., conducted a reconsideration evaluation of Plaintiff's physical RFC on May 4, 2016.  Dr. Wheelock agreed with Dr. McFee's assessment, except that Dr. Wheelock indicated that Plaintiff did not have limitations concerning concentrated exposure to extreme heat (A.R. at 140-42).  Dr. Wheelock opined that Plaintiff was limited to performing unskilled, sedentary work and was not disabled (A.R. at 145-46).

Therese Harris, Ph.D., generally agreed with Dr. Whitehorn's assessment with "minor" modifications.  According to Dr. Harris, Plaintiff was able to understand and remember simple

instructions, adapt to minor changes in work demands, and manage work-related stress/pressures (A.R. at 139, 142-44).

D.  Function Report

Plaintiff completed a second function report on April 4, 2016, which generally mirrored the form that she completed on October 28, 2015, but noted additional limitations (A.R. at 277-85, 309-16).  In April 2016, Plaintiff indicated that her daily activities consisted of watching TV, reclining, folding laundry while seated, and socializing with others on the phone or in person.  She indicated that, recently, she needed "a lot more" assistance to care for her mother and her children and to prepare sandwiches and frozen meals.  She was unable to dress or wash her lower body.  She noted limitations in her ability to perform the following functions:  lifting; squatting; bending; standing for more than two or three minutes; reaching; walking without a cane; sitting for more than ten or fifteen minutes; kneeling; climbing stairs; remembering; completing tasks; concentrating for more than ten or fifteen minutes; understanding; and following instructions.  She could walk about five steps and had used a cane to walk for "maybe a year or so."  Although she was able to drive, she only went to medical appointments.  According to Plaintiff, at the time she completed the form, she was not taking medication that managed her difficulty with memory and concentration.  Plaintiff indicated that she read slowly, could follow spoken instructions better than written instructions, and handled stress well, but "hate[d]" changes in routine (A.R. at 309-16).

E.  The ALJ Hearing

Plaintiff and independent vocational expert ("VE") Erin Bailey testified at the hearing before the ALJ on September 13, 2017 (A.R. at 35).  Plaintiff described her mental and physical condition.

1.      Plaintiff's Testimony

Plaintiff testified that she was unable to work because she experienced constant pain in both hips, her back, and her knees (A.R. at 42).  According to Plaintiff, she was born "without any hip sockets" (A.R. at 57).  She had fourteen surgical procedures to correct her hips when she was a child (A.R. at 57-58).  From January 1, 2014 until she underwent a total replacement of her left hip at UMass in June 2016, she was bedridden and was unable to care for herself or her mother, walk, stand, sit, use stairs, go outdoors, and drive (A.R. at 58, 61, 62).[3]  Her ability to walk normally was impaired because her left leg was about two inches shorter than her right leg (A.R. at 60).  When she used a shoe lift in an attempt to correct the disparity, it "caused problems in" her back and knees (A.R. at 61).  She lost her balance and dropped her younger daughter when the child was ten months old (A.R. at 71).[4]  Because Plaintiff continued to have difficulty with balance after the hip replacement surgery, she used a cane and used two canes when she walked outside (A.R. at 63).  Plaintiff testified that she had used a cane for "at least five or six years . . . could be longer" (A.R. at 63).  Plaintiff indicated that she was beginning to experience pain from the deterioration of her right hip (A.R. at 64).

Plaintiff's back pain began when she was about eighteen years old.  She wore a brace to correct the condition (A.R. at 65).  Plaintiff testified that she had pain in her lower back that

---

[3] From 2012 until late 2015 or early 2016, Plaintiff was employed caring for her mother in the home that they shared in Massachusetts (A.R. at 40-41, 43, 49-51, 61).  In late 2015 or early 2016, Plaintiff's mother hired an aide to provide all her care because Plaintiff's physical condition prevented her from performing the necessary tasks (A.R. at 43, 49-51).  Plaintiff's mother moved from Plaintiff's home in May 2017 (A.R. at 52-53, 73).

[4] Plaintiff's younger daughter was born on March 18, 2014 and was three years old at the time of the hearing in September 2017 (A.R. at 35, 57, 72, 525, 533).

radiated into her legs (A.R. at 66-67).  According to Plaintiff, the injections relieved "a little bit" of the pain for about three or four weeks (A.R. at 67).

Plaintiff's right knee swelled or gave out "if [she] step[ped] the wrong way."  She treated it with pain medication (A.R. at 73).  She was treated by a rheumatologist for her wrist pain and arthritis (A.R. at 73).

Plaintiff attended "some" special education classes and had an Individual Education Plan ("IEP") in high school because she had difficulty "focusing, . . . concentrating, . . . reading, and comprehending" (A.R. at 53, 57).  She began taking Adderall when she was seven or eight years old and took it until she got pregnant in 2011 (A.R. at 55).  The medication improved her ability to concentrate and focus, but it "didn't resolve everything" (A.R. at 55, 57).  In order to comprehend written words, she had to read the material aloud two or three times (A.R. at 57). Plaintiff was diagnosed with ADHD in July 2015 (A.R. at 55).  She was not taking Adderall at the time of the hearing because her counselor left the clinic before she referred Plaintiff to a psychiatrist (A.R. at 56).

Plaintiff described the limitations on her daily activities.  Her fiancé, both sets of grandparents, and a friend helped her care for her three and six year old children every day (A.R. at 72, 81-82).  She used a ramp to get from her garage to the basement where she used an electric chair lift to ascend the stairs into the upper floors of her home (A.R. at 76).[5]  On the days she grocery shopped with her fiancé, she was not able to engage in any other activities (A.R. at 75). She pushed and leaned on the cart while shopping, but her partner took the items off the shelves, carried the groceries into the house, unpacked them, and put them away with Plaintiff's assistance (A.R. at 75).  Plaintiff was not comfortable driving because of "problems" with her

---

[5] Plaintiff's mother had also used the ramp and chair lift (A.R. at 76).

hands and back (A.R. at 79).  She experienced back pain when lifting a gallon of milk, bending, reaching, and sitting for fifteen minutes (A.R. at 74, 76-78).  She relieved the pain by walking or reclining (A.R. at 74).  At the time of the hearing, Plaintiff was lying down for about three or four hours each day (A.R. at 74).  She testified that pain would preclude her from performing a job that permitted her to alternate sitting and standing every twenty minutes (A.R. at 79).  She could not work assembling light objects either because pain limited her ability to sit for an extended period of time and restricted her dexterity (A.R. at 79-80).

Plaintiff used oxycodone to relieve pain after her hip replacement surgery in June 2016 (A.R. at 67).  She testified that she had not gotten a prescription for oxycodone since January 2017 and took Aleve for pain relief (67-68).  Although Aleve was supposed to last twelve hours, she took four to six a day and took four Aleve P.M. tablets every night in order to get "a couple hours" of sleep (A.R. at 70).  Pain caused her to awaken two or three times each night (A.R. at 81).  She did not feel rested in the morning (A.R. at 81).

2.      The VE's Testimony

In order to elicit the VE's testimony of whether Plaintiff could perform her past jobs or jobs that existed in the regional and national economy, the ALJ asked the VE to assume a person with Plaintiff's age, education, and work experience who could engage in light work "except that the stand/walk times are reduced to two hours of either."

> She can no more than occasionally operate foot controls bilaterally.  She has postural limitations, she cannot climb ladders, ropes, or scaffolds.  She can occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl.  She has environmental limitations, she can tolerate no more than occasional exposure to hazards such as unprotected heights or moving mechanical parts, and no more than frequent exposure to extreme cold or vibration.  Finally, she has mental limitations.  She's limited to simple, routine tasks.

(A.R. at 83-84). The VE opined that the hypothetical person could not perform Plaintiff's past work as a caregiver, but the person could perform the work of a ticket seller, a cashier, and an inspector (A.R. at 84). If pain caused the hypothetical individual to be off task fifteen percent of the time in an eight-hour workday in addition to normal breaks, there were no jobs available in the national economy that the person could perform (A.R. at 85).

## III. THE COMMISSIONER'S DECISION

### A. The Legal Standard for Entitlement to DIB and SSI

In order to qualify for DIB and SSI, a claimant must demonstrate that she is disabled within the meaning of the Act. A claimant is disabled for purposes of DIB and SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. §§ 404.1520(a)(4)(i-v), 416.920(a)(4)(i)-(v).[6] The hearing officer must determine: (1) whether the claimant is

---

[6] Because the administrative regulations applicable to Title II DIB, which are found in 20 C.F.R. Part 404, and the regulations applicable to Title XVI SSI, which are found in 20 C.F.R. Part 416,

engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id.*

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate her RFC. *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of jobs

---

are the same in all relevant respects, for simplicity herein, the Title II regulations in Part 404 will be cited for both.

in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations.  *See Goodermote*, 690 F.2d at 7.

B.    The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote,* 690 F.2d at 6-7.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 1, 2014 (A.R. at 16).  *See* 20 C.F.R. § 404.1571 *et seq.*  At step two, the ALJ found that Plaintiff had the following severe impairments:  congenital hip dysplasia; osteoarthritis in her left hip; obesity; ADHD; and an anxiety disorder (A.R. at 17).  *See* 20 C.F.R. § 404.1520(c).  The ALJ found the following alleged impairments to be non-severe:  congenital bilateral interphalangeal joint fusion; lumbar spondylosis; GERD; and right knee suprapatellar effusion (A.R. at 17).  For purposes of step three, the ALJ reviewed Plaintiff's impairments and determined that her impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. at 18-19).  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step four to determine whether she could perform past relevant work, and, if the analysis continued to step five, to determine if she could do other work.  *See* 20 C.F.R. § 404.1520(e).  The ALJ determined that Plaintiff had the RFC to perform light work[7] with the following additional limitations:

_____

[7] The SSA regulations define light work as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or

lifting 20 pounds occasionally and 10 pounds frequently; carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours, standing for 2 hours, walking for 2 hours; and she can occasionally operate foot controls bilaterally. The claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can tolerate occasional exposure to hazards such as unprotected heights and moving mechanical parts. She can tolerate frequent exposure to vibration and extreme cold. The claimant was limited to performing simple, routine tasks.

(A.R. at 19). At step four, the ALJ found that Plaintiff would not have been able to perform her past relevant work through the date last insured (A.R. at 27). *See* 20 C.F.R. § 404.1565. However, considering Plaintiff's age, education, work experience, and RFC, based on the VE's testimony, the ALJ found that Plaintiff could perform the jobs of a ticket seller, a cashier, and an inspector (A.R. at 27-28). *See* 20 C.F.R. §§ 404.1569, 404.1569(a). Consequently, on October 11, 2017, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act, at any time from January 1, 2014, the alleged onset date, through the date of the decision (A.R. at 27-28). *See* 20 C.F.R. § 404.1520(g).

---

when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the Commissioner] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The SSA regulations define sedentary work as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

IV.    STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).

Judicial review is limited to determining "'whether the [ALJ's] final decision is supported

by substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill,*

892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The

court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are

supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the

evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if

the record could also justify a different conclusion."  *Applebee v. Berryhill*, 744 F. App'x 6, 6

(1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d

218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more

deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence

is required to meet the benchmark, a preponderance of evidence is not."  *Purdy v. Berryhill*, 887

F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51,

56 (1st Cir. 2003)).  In applying the substantial evidence standard, the court must be mindful that

it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve

conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x

at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to

experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

V.    ANALYSIS

A.    **The ALJ's step three determination that Plaintiff did not meet the
      requirements of  Listing 1.02A was supported by substantial evidence.**

Plaintiff claims that the ALJ erred at step three of the sequential evaluation process by "disregarding the objective evidence of a severe disability that meets or equals [Listing] 1.02A" (Dkt. No. 17 at 11). Specifically, Plaintiff alleges that the ALJ ignored the evidence of a "[m]ajor dysfunction of [her] bilateral hip joints due to congenital dysplasia with inability to ambulate one block at a reasonable pace on rough or uneven surfaces" (Dkt. No. 17 at 11). The ALJ's determination that Plaintiff failed to establish that she was presumptively disabled was supported by substantial evidence.

"At step three, 'it is the claimant's burden to show that [s]he has an impairment or impairments which meets or equals a listed impairment in Appendix 1' of the Social Security regulations." *Arrington v. Colvin*, 216 F. Supp. 3d 217, 233 (D. Mass. 2016), *aff'd sub nom. Arrington v. Berryhill*, No. 17-1047, 2018 WL 818044 (1st Cir. Feb. 5, 2018) (quoting *Torres v. Sec'y of Health & Human Servs.*, 870 F.2d 742, 745 (1st Cir. 1989)). "If the claimant makes such a showing, 'the Social Security Administration will find the claimant disabled, without regard to the claimant's age, education, or work experience.'" *Id.* (quoting *Arrington v. Soc. Sec. Admin.,* 358 F. App'x 89, 93 (11th Cir. 2009)). "An impairment meets the listings only when it manifests the specific findings described in the set of medical criteria for a particular listed impairment." *Martinez Nater v. Sec'y of Health & Human Servs.*, 933 F.2d 76, 77 (1st Cir. 1991) (per curiam) (quotations and citation omitted). "An impairment equals a listed impairment when the set of symptoms, signs and laboratory findings in the medical evidence supporting the claimant are at least equivalent in severity to the set of medical findings for the listed impairment." *Id.* (quotations and citation omitted).

The ALJ explained that Plaintiff failed to present evidence that her condition met or medically equaled the severity requirement of Listing 1.02A (A.R. at 18).

Listing 1.02 provides:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02. Therefore, in order to meet the criteria of Listing 1.02A, Plaintiff had the burden of proving that that she was "incapable of ambulating effectively . . . ." *Arrington*, 216 F. Supp. 3d at 234. Having the "inability to ambulate effectively" is further defined in 1.00B2b as meaning "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b(1). "[E]xamples of ineffective ambulation include . . . the inability to walk without the use of a walker, two crutches or two canes [and] the inability to walk a block at a reasonable pace on rough or uneven surfaces . . . ." 20 C.F.R. Pt. 404, Subpt. P, App.1 § 1.00B2b(2).

Here, the ALJ acknowledged Plaintiff's congenital hip dysplasia as a severe impairment at step two and noted her "long history of difficulty with her hips" (A.R. at 17, 26).[8] However, Plaintiff failed to sustain her burden of establishing that her hip condition rendered her unable to walk without the use of a walker, two crutches, or two canes or the inability to walk a block on

---

[8] Plaintiff failed to present evidence of "a gross anatomical deformity" of her right knee as would be required to meet Listing 1.02A. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.

rough or uneven surfaces. She walked without an assistive device on August 31, 2015 and requested a new "quad cane" on October 30, 2015 (A.R. at 562, 647-48). On July 28, 2016, after the total replacement of Plaintiff's left hip on June 7, 2016, the VNA therapist reported that Plaintiff walked frequently, used a cane (one-handed device) to walk on the uneven and sloped grassy surfaces in her yard, and walked independently without a device on all other surfaces, including in her home and on level outdoor surfaces (A.R. at 1148, 1151, 1153, 1176). On September 6, 2016, Plaintiff stated that walking was "fine" and she "chas[ed]" her children, on November 16, 2016, she reported "occasional" difficulty walking, and on January 17, 2017, Plaintiff indicated that she was able to walk for fifteen minutes, but found it painful to walk on hard floors (A.R. at 23, 24, 1209, 1213, 1288). Her gait was normal on February 16, 2017 (A.R. at 1294).

Plaintiff's claim fails for the additional reason that Dr. McFee and Dr. Wheelock, the state agency consultants who assessed Plaintiff's physical RFC prior to her total hip replacement, considered Listing 1.02 and opined that Plaintiff was not disabled (A.R. at 94, 99, 139, 145). The ALJ assigned "partial weight" to those opinions because the number of hours the consultants determined that Plaintiff could stand and/or walk and sit "appear[ed] to not add to a full [eight-hour] workday" (A.R. at 25). However, the ALJ assigned "substantial weight" to the remainder of their opinions, which he found to be "consistent with the record as a whole" (A.R. at 25). *See Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004) (the ALJ was entitled to rely on forms completed by two state agency physicians indicating that the plaintiff was not disabled, which "conclusively established" that the plaintiff did not meet or medically equal a listing at step three); *Scarafone v. Colvin*, Civil Action No. 13–10477–RWZ, 2015 WL 71490, at *3, *4 (D. Mass. Jan. 6, 2015) (finding that the opinions of the state agency medical consultants, who

evaluated whether plaintiff's impairments met or medically equaled a Listing at the initial and reconsideration levels of the administrative review process, provided substantial evidence for the ALJ's finding at step three).

Because Plaintiff failed to sustain her burden of demonstrating that she met or medically equaled the requirements of Listing 1.02A, the ALJ's step three decision was supported by substantial evidence.

## B. The ALJ's determination of Plaintiff's RFC was supported by substantial evidence.

In attacking the ALJ's determination of her RFC on the ground that it was not supported by substantial evidence, Plaintiff dissects the ALJ's decision and points to a plethora of records that she claims the ALJ ignored (Dkt. No. 17 at 10-15). The Commissioner counters that the ALJ "carefully considered the extensive record" and "crafted the RFC based on four state agency medical opinions, which were consistent with the record, including more recent treatment records indicating that Plaintiff's condition significantly improved following hip replacement surgery" (Dkt. No. 20 at 12).

"The 'claimant bears the burden of proving the limitations that factor into the Commissioner's residual functional capacity finding.'" *Simons v. Colvin*, CIVIL ACTION NO. 13-11668-MBB, 2015 WL 4275252, at *19 (D. Mass. July 15, 2015) (quoting *Bard v. Soc. Sec. Admin. Comm'r,* 736 F. Supp. 2d 270, 276 (D. Me. 2010)). To succeed on her claim that the ALJ erred in formulating the RFC, "Plaintiff must show not only the existence of evidence in the record supporting her position but must also demonstrate the evidence relied on by the ALJ is either insufficient, incorrect, or both." *Greene v. Astrue,* Civil Action No. 11-30084-KPN, 2012 WL 1248977 at *3 (D. Mass. Apr. 12, 2012). In view of the record evidence and the fact that

Plaintiff did not present a medical opinion stating limitations more restrictive than those stated

by the ALJ, Plaintiff has failed to establish limitations greater than those included in the RFC.

Plaintiff's principal complaint is that the ALJ ignored evidence concerning the condition

of her hips, back, right knee, hands and wrists, and mental state.  Contrary to Plaintiff's claim, the

ALJ's decision is not undermined by the fact that he did not discuss every piece of evidence in

the extensive administrative record.  Although an ALJ is "required to consider all the evidence"

in a claimant's file, *DaSilva-Santos v. Astrue,* 596 F. Supp. 2d 181, 188 (D. Mass. 2009), "[a]n

ALJ is not required to expressly refer to each document in the record, piece-by-piece."

*Rodriguez v. Sec'y of Health & Human Servs.*, No. 90-1039, 1990 WL 152336, at *1 (1st Cir.

Sept. 11, 1990) (per curiam).

> Courts have held that an ALJ's failure to address a specific piece or pieces of evidence
> did not undermine the validity of [his] conclusion, for example, when that conclusion was
> supported by citations to substantial medical evidence in the record and the unaddressed
> evidence was either cumulative of the evidence discussed by the ALJ or otherwise failed
> to support the claimant's position.

*Lord v. Apfel*, 114 F. Supp. 2d 3, 13 (D.N.H. 2000) (citing cases).

As to Plaintiff's hips, the ALJ recognized Plaintiff's history of surgeries, left hip pain and

reduced range of motion, antalgic gait, leg length discrepancy, and left hip replacement on June

7, 2016 (A.R. at 21-26).  There was substantial evidence to support the ALJ's determination that

"significant improvement was documented following [Plaintiff's total left hip] replacement"

(A.R. at 26).[9]  About a month after the surgery, Plaintiff told Dr. Katzen that she was "doing

_____

[9] To the extent that Plaintiff's left hip condition caused more significant limitations than those
she experienced after her recovery from hip replacement surgery, she has not submitted evidence
substantiating that those limitations were so severe as to be disabling.  According to the Brien
Center records from September to December 2015, Plaintiff was the primary caregiver for her
mother and two daughters and had little assistance in this role (A.R. at 432).  The limitations and
restrictions assessed by the ALJ essentially mirrored those assessed by Drs. McFee and
Wheelock, who reviewed Plaintiff's medical records through May 2016, shortly before her hip

well," could walk for ten minutes, and used a cane, but did not need it (A.R. at 23, 1207).  The

ALJ took note of her complaint of a sharp pain that radiated into her femur when she stood for an

extended period of time (A.R. at 23, 1207).  On July 28, 2016, Plaintiff told the VNA therapist

that the pain in her left thigh did not stop her "from doing what [she] needed to do" (A.R. at

1153).  She was walking "fine" when she saw Dr. Katzen on September 6, 2016, but she reported

that she experienced pain in the afternoon after "chasing" her two children (A.R. at 23, 1209).

On November 16, 2016, Plaintiff reported to Dr. Rashid, her PCP, that her hip pain had

improved after the hip surgery and she was not taking any pain medication (A.R. at 23, 1288).

On January 17, 2017, Plaintiff told Dr. Katzen that she usually was able to navigate stairs "step

over step" and could walk for fifteen minutes.  Dr. Katzen noted that Plaintiff's gait was "good."

The x-ray of her left femur and hip showed "good positioning with no sign [of] loosening or

osteolysis," her leg lengths "look good," alignment was good, and there was no sign of fracture.

Dr. Katzen indicated that Plaintiff's pain would be treated "conservatively" over the next six

months (A.R. at 24, 1213-14).  Plaintiff walked with a normal gait and moved her arms and legs

without discomfort on February 16, 2017 (A.R. at 1294).

---

replacement surgery, and concluded that the records, while substantiating Plaintiff's significant
physical impairments, did not add up to a disabling condition (A.R.. at 88-90, 92-93, 95-97, 99,
134-38, 140-42, 145-46).  Plaintiff has not argued for a closed period of disability, nor does the
record include opinion evidence that supports limitations and restrictions in activities prior to
Plaintiff's hip replacement surgery that would support a finding of disability.  Thus, the ALJ was
entitled to rely on the opinions of the state agency consultants.  *See Boulia v. Colvin,* Case No.
15-cv-30103-KAR, 2016 WL 3882870, at *8 (D. Mass. July 13, 2016) (where "there was no
opinion evidence related to disability that would have been presumptively entitled to controlling
weight under the treating physician rule," the ALJ was entitled to rely on the opinions of the state
agency consultants to support his assessment of Plaintiff's physical limitations); *Delgado-Benitez
v. Astrue*, Civil No. 10-2065 (MEL), 2012 WL 1110157, at *9 (D.P.R. Mar. 30, 2012) ("it was
permissible for the ALJ to rely on the state agency opinions in reaching his decision, especially
considering that they were the only medical opinions in the record regarding plaintiff's condition
during the coverage period.").

The RFC accurately reflected the condition of Plaintiff's right hip. The ALJ recognized Dr. Dudley's May 11, 2015 note indicating that Plaintiff's right hip range of motion was "moderately limited" with "mild pain" (A.R. at 21, 419). Plaintiff's right hip showed "minimal degenerative changes" on the October 6, 2015 x-ray and appeared "unremarkable" on the October 9, 2015 MRI (A.R. at 478, 494). On April 11, 2016, Plaintiff told Dr. Dudley that her right hip was achy "here and there," but was not as painful as her left hip (A.R. at 904). The ALJ noted Dr. Katzen's observation that the April 18, 2016 x-ray showed "mild" osteoarthritis of Plaintiff's right hip and pubic symphysis (A.R. at 23, 1197 [the right hip x-ray "looked good"], 1199). There was no tenderness over Plaintiff's right hip on July 1, 2016 and November 16, 2016 (A.R. at 1287, 1290).

Notwithstanding Plaintiff's complaint that the ALJ ignored the evidence of Plaintiff's lower back condition that was documented in the treatment records of February 5, March 31, and April 3, 2015, and January 6, September 6, November 16, and December 7, 2016, the ALJ fully considered the evidence concerning Plaintiff's back when crafting the RFC for "a limited range of sedentary to light work," which included additional exertional, postural, and environmental limitations (A.R. at 25-26). Although the ALJ did not recount Dr. Dudley's findings of February 5, 2015, they did not support Plaintiff's position because Dr. Dudley observed full range of motion in Plaintiff's back on that date (A.R. at 423). Contrary to Plaintiff's claim, the ALJ recognized Plaintiff's complaints of severe bilateral low back, buttock, and left hip pain on March 31, 2015 (A.R. at 21). The ALJ considered the April 3, 2015 MRI of Plaintiff's lumbar spine, which showed a transitional anatomy of the lumbosacral junction with lumbarization of S1, left sided S1 spondylolysis, and mild levoconvex scoliosis. There was no spinal canal or nerve root compromise at L5-S1 (A.R. at 17, 521-22). The ALJ noted that the August 18, 2015

x-ray documented normal bilateral sacroiliac joints (A.R. at 22, 430). The ALJ further considered the following: on August 31, 2015, the Pain Center noted that Plaintiff's range of motion was limited and diagnosed sacroiliitis, low back pain, and joint pain of the hip; on January 6, 2016, Plaintiff complained of generalized dull and aching pain in her low back and was diagnosed with low back pain, sacroiliitis, and lumbar spondylosis; on April 11, 2016, Plaintiff told Dr. Dudley that her back "bothered her here and there" when she reclined but her back pain was overshadowed by her hip pain and Dr. Dudley surmised that Plaintiff's back condition would improve after the left hip replacement; on September 6, 2016, Plaintiff stated that she treated her back pain with Tylenol; on November 16, 2016, Plaintiff stated that her hip osteoarthritis and low back pain made walking difficult; on December 7, 2016, she had mild to moderate pain in the lumbar spine and buttocks (A.R. at 22, 23, 24, 563, 692, 694, 904, 906-07, 1209, 1216, 1288). In addition, the ALJ noted that the bilateral sacroiliac joint corticosteroid injections that were administered on the following dates were effective in relieving Plaintiff's symptoms: April 6, 2015 (degenerative changes were noted), October 15, 2015, January 28, 2016, December 20, 2016, and June 20, 2017 (A.R. at 17, 21, 23, 24, 482, 557, 559, 567, 568, 589, 592-93, 694, 699, 1213, 1215, 1424-25, 1430-31). The ALJ also acknowledged Plaintiff's statement that the injections allowed her to perform her daily activities with less pain along with her February 16, 2017 report that her low back pain was "much better" after she received the bilateral sacroiliac joint injection and that she had no back pain (A.R. at 17, 24, 1218 [Plaintiff was "happy with the results"], 1292, 1294). *See Beshaw v. Comm'r of Soc. Sec.,* 8:15-CV-556 (MAD), 2016 WL 4382702, at *15 (N.D.N.Y. Aug. 16, 2016) (ALJ considered the plaintiff's positive reaction to a sacroiliac joint corticosteroid injection when crafting the RFC); *Tetreault v. Astrue,* 865 F. Supp. 2d 116, 125-26 (D. Mass. 2012) (RFC was supported, in part, by plaintiff's

benefit from epidural injections).  In sum, the ALJ's determination that Plaintiff's back condition "did not cause more than a minimal limitation on her ability to perform basic work activities" was supported by substantial evidence (A.R. at 17). [10]

The ALJ recognized the records addressing the condition of Plaintiff's right knee and did not "cherry pick" the evidence or ignore her complaints of pain as Plaintiff maintains (Dkt. No. 17 at 10).  The ALJ considered the December 5, 2014 x-ray of Plaintiff's right knee, which showed a small suprapatellar effusion, mild edema within the Hoffa fat pad, preserved joint spaces, and no acute fracture, dislocation, or focal osseous lesion (A.R. at 17, 524).  Dr. Rashid interpreted the x-ray as showing that there was "no arthritic change" (A.R. at 626).  The ALJ acknowledged Dr. Rashid's December 19, 2014 diagnosis of right knee pain and reviewed Dr. Dudley's notes of Plaintiff's May 11, 2015 visit, which indicated that Plaintiff's right knee was swollen and painful (A.R. at 17, 21, 417, 420, 657).  Thereafter, Plaintiff indicated that she was not experiencing pain in her right knee and the treatment providers consistently observed that Plaintiff's right knee was "stable" (A.R. at 17, 23, 412, 623, 626, 904, 1287).

The RFC did not include limitations caused by Plaintiff's hand and wrist pain because they were not supported by the record (Dkt. No. 17 at 7, 11, 13).  Plaintiff reported "occasional tingling [and] numbness of [her] bilateral hands and feet" during her November 16, 2016 visit to her PCP (A.R. at 1288).  She testified that her hands "go numb" and that Dr. Dudley, the rheumatologist, treated her wrist (A.R. at 71, 73).  However, there is no indication in the records that Plaintiff was treated for a wrist or hand condition or that the use of her wrists and hands was

---

[10] Plaintiff's criticism of the ALJ for failing to account for "muscle spasms" in her back is similarly unavailing (Dkt. No. 17 at 8).  The ALJ referenced the November 16, 2016 PCP record that contained the only mention of "mild paravertebral muscle spasm over the lower lumbar region" as well as the note that indicated that there was no paravertebral muscle spasm (A.R. at 21, 23, 631-33, 1290-91).

impaired (A.R. at 1288-91). On February 5, 2015, Plaintiff told Dr. Dudley that she did not have hand pain, swelling, or stiffness (A.R. at 421). On August 18, 2015, Plaintiff stated that her joint pain was limited to her hips and back (A.R. at 412). Dr. Dudley consistently observed that Plaintiff had full range of motion in her wrists, demonstrated "full claw and fist" with her hands, and there was no tenderness or synovitis in either (A.R. at 414, 419, 423, 906). In addition, on her function reports, Plaintiff indicated that she had no limitations on the use of her hands and the state agency consultants found that she did not have manipulative limitations (A.R. at 96, 141, 283, 314).

Finally, Plaintiff alleges that the ALJ ignored her mental health deficits. Specifically, she claims that the RFC failed to acknowledge the limitations caused by her medication-induced "drowsiness and fatigue," ADHD, and anxiety (Dkt. No. 17 at 8, 13-14). Although the ALJ recognized the Brien Center record that noted Plaintiff's "sleep disturbance," there is no record support for Plaintiff's claim that her medication caused it (A.R. at 24, 438). To the contrary, Plaintiff's Pain Questionnaires, other SSA forms, and treatment providers' records indicated that she did not experience side effects from her medications (A.R. at 292, 307, 325, 436-37, 673). She testified that she was tired because pain interfered with her sleep (A.R. at 81). In addition, her diagnoses of ADHD and anxiety were reflected in the RFC's limitations to the performance of simple, routine tasks (A.R. at 18-19, 21-22).

The only opinions in the administrative record are those of the state agency consultants who opined that Plaintiff was not disabled through the dates of their assessments, December 24, 2015 and May 16, 2016 (A.R. at 115, 147). *Compare Lemieux v. Berryhill,* 323 F. Supp. 3d 224, 230 (D. Mass. 2018) (remanding for explanation of rejection of treating source opinions concerning limitations on Plaintiff's ability to sit due to chronic back pain that were supported by

the record).  The RFC finds support in those opinions, which Plaintiff does not challenge.

"[N]onexamining medical expert reports, like the ones used in this case, can, standing alone,

serve as substantial evidence in support of a residual functional capacity assessment." *Blackette*

*v. Colvin*, 52 F. Supp. 3d 101, 116 (D. Mass. 2014) (citing *Berrios Lopez v. Sec'y of Health &*

*Human Servs.,* 951 F.2d 427, 431 (1st Cir. 1991)).  Although the ALJ afforded "partial weight"

to Dr. McFee's and Dr. Wheelock's opinions because their assessments of Plaintiff's ability to

stand and/or walk for "[s]lightly less" than two hours and to sit for "[a]bout" six hours did not

"appear" to total an eight-hour workday, he assigned "substantial weight" to the remainder of

their opinions and to Dr. Harris' and Dr. Whitehorn's opinions of Plaintiff's mental RFC because

they were consistent with the objective medical findings (A.R. at 25).  The RFC for light work

with additional limitations generally mirrors the consultants' assessments of Plaintiff's physical

and mental limitations (A.R. at 19, 95, 140).  The discrepancy between the consultants' opinion

of Plaintiff's ability to stand and walk and the RFC's limitations can be explained by the fact that

the agency consultants assessed Plaintiff's ability to stand and walk before she underwent the

total hip replacement whereas the ALJ determined the RFC after the surgery (A.R. at 19, 95-97,

140-42).  "[T]he determination of the ultimate question of disability is for the ALJ, not for the

doctors or for the reviewing [c]ourts." *Candelario v. Comm'r of Soc. Sec.*, 547 F. Supp. 2d 92,

97 (D.P.R. 2008).  *See* 20 C.F.R. § 404.1546(c) ("the administrative law judge . . . is responsible

for assessing [the claimant's] residual functional capacity.").  The limitations on Plaintiff's ability

to stand and walk that were included in the RFC reflect the post-surgical improvements in

Plaintiff's condition as documented in the treatment records (A.R. at 26).  *See Maniscalco v.*

*Colvin*, 167 F. Supp. 3d 207, 217 (D. Mass. 2016) ("an ALJ is not precluded from rendering

common sense judgments about [physical] functional capacity based on raw medical evidence,

as long as the ALJ does not overstep the bounds of a lay person's competence.") (citing *Gordils v. Sec'y of Health and Human Servs.,* 921 F.2d 327, 329 (1st Cir. 1990)).[11]

Plaintiff failed to sustain her burden of demonstrating that the RFC was not supported by substantial evidence. Accordingly, the Commissioner's decision should be affirmed.

### C. The ALJ's assessment of Plaintiff's credibility was supported by substantial evidence.

Plaintiff contends that the ALJ erred by failing to credit her statements regarding the intensity of her pain and her concomitant physical limitations. "[I]n a social security disability case, '[a] fact-finder's assessment of a party's credibility . . . is given considerable deference and, accordingly, a reviewing court will rarely disturb it." *Smith v. Berryhill,* 370 F. Supp. 3d 282, 291 (D. Mass. 2019) (second alteration in original) (quoting *Anderson v. Astrue,* 682 F. Supp. 2d 89, 96 (D. Mass. 2010)).

Social Security Ruling 16-3p provides guidance on evaluating symptoms in disability cases. According to that ruling, "[i]n determining whether an individual is disabled, [the ALJ] consider[s] all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other

_____

[11] Plaintiff alleges that the VE's opinion should be stricken because it was not supported by the evidence (Dkt. No. 17 at 12, 13, 14). However, Plaintiff's claim is waived because she failed to object to the VE's opinion at the hearing before the ALJ. *See Bonner v. Colvin,* 153 F. Supp. 3d 465, 477-78 (D. Mass. 2015) (citing *Mills v. Apfel,* 244 F.3d 1, 8 (1st Cir. 2001)). Even if Plaintiff had preserved her claim, she has failed to demonstrate a basis to exclude the VE's opinion. "The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence at the fifth step of the analysis." *Sousa v. Astrue,* 783 F. Supp. 2d 226, 235 (D. Mass. 2011). "In order to be substantial evidence, however, the opinion of the vocational expert must be in response to a hypothetical that accurately describes the claimant's limitations." *Id.* Here, at step five, the ALJ relied on the VE's response to a hypothetical question that included the RFC set forth in the ALJ's written decision (A.R. at 19, 83-84). Because the RFC was supported by substantial evidence, it follows that the hypothetical was also supported by the same quantum of evidence.

evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017).[12]

The analysis involves a two-step process. *Id.* The ALJ first considers "whether there is an

underlying medically determinable physical or mental impairment(s) that could reasonably be

expected to produce an individual's symptoms, such as pain." *Id.* at *3. "Second, once an

underlying physical or mental impairment(s) that could reasonably be expected to produce an

individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those

symptoms to determine the extent to which the symptoms limit an individual's ability to perform

work-related activities . . . . " *Id.*

> When undertaking the second step, an ALJ must first determine whether the claimant's alleged symptoms are consistent with the objective medical evidence. If not, then the ALJ must consider the other evidence in the record, including "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the SSA's] regulations." SSR 16-3p, 2016 WL 1119029, at *5. The factors to which SSR 16-3p refers are set forth in 20 C.F.R. § [416.929](c)(3), and are sometimes called the *Avery* factors . . . .[13]

*Martin v. Berryhill*, Civil No. 18-cv-461-JL, 2019 WL 1987049, at *5 (D.N.H. May 6, 2019)

(citing *Avery v. Sec'y of Health & Human Servs.,* 797 F.2d 19, 29 (1st Cir. 1986)).

The ALJ followed the analysis required by SSR 16-3p. At the first step, the ALJ

recognized that Plaintiff's medically determinable impairments could reasonably be expected to

---

[12] A "symptom" is defined as "the individual's own description or statement of his or her physical or mental impairment(s)." SSR 16-3p, 2017 WL 5180304, at *2.

[13] The Avery factors are:

> (1) [t]he nature, location, onset, duration, frequency, radiation, and intensity of pain; (2)[p]recipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3)[t]ype, dosage, effectiveness, and adverse side effects of any pain medication; (4)[t]reatment, other than medication, for pain relief; (5)[f]unctional restrictions; and (6)[t]he claimant's daily activities.

*Avery,* 797 F.2d at 29.

cause the alleged symptoms. At the second step, the ALJ found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not fully supported by the objective medical evidence and the other relevant evidence (A.R. at 21).

The ALJ's determination – that Plaintiff's testimony was "at odds" with the record -- is supported by substantial evidence including the specific evidence the ALJ identified (A.R. at 26). *See Bazile v. Apfel,* 113 F. Supp. 2d 181, 187 (D. Mass. 2000) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."). First, Plaintiff's testimony concerning her condition before the hip replacement surgery on June 7, 2016 was not consistent with the objective medical evidence. The ALJ pointed to the Berkshire Orthopaedic Associates' treatment records indicating that Plaintiff was full weight bearing prior to her surgery on June 7, 2016 as being inconsistent with Plaintiff's testimony that she was mostly bedridden from January 1, 2014 until she underwent the procedure (A.R. at 58, 61, 469, 471). In addition, the Brien Center record of September 3, 2015 indicates that Plaintiff cared for her "invalid mother and two small children with little outside assistance" (A.R. at 432, 443). *See Franceschi v. Astrue,* Civil Action No. 11-40217-TSH, 2013 WL 1285478, at *12 (D. Mass. Mar. 25, 2013) (the ALJ considered the discrepancies between the plaintiff's statements and the treatment records when assessing the severity of his symptoms).

Second, the ALJ's determination that Plaintiff "exaggerate[ed]" the severity of her post-surgical condition was supported by the examples the ALJ recited and the record. Plaintiff testified that, at the time of the hearing, she spent three to four hours of each day in bed, needed help caring for her children and her mother, and "constant[] pain" prevented her from lifting and carrying more than five pounds, sitting for more than ten or fifteen minutes, walking without one

or two canes, standing, bending, and reaching (A.R. at 42, 63, 72, 74, 76-78). However, Plaintiff's statements concerning her post-surgical physical abilities were inconsistent with the state agency consultants' opinions, which were the only opinions in the record and were rendered before she underwent the total left hip replacement surgery, and the post-surgical treatment records, which documented her ability to perform daily activities, including caring for her two young children (A.R. at 93-100, 138-46, 1209, 1215, 1218, 1288, 1292). *See Barker v. Comm'r of Soc. Sec.*, No. 96-1622, 1996 WL 578664, at *2 (1st Cir. Oct. 9, 1996) (per curiam) ("Claimant's allegations that her pain significantly limits her ability to sit or stand is inconsistent with the opinions of the medical consultants. In addition, the ALJ properly could find that claimant's allegations are inconsistent with her reported activities."); *Avery,* 797 F.2d at 29 (the ALJ must consider "the claimant's daily activities" when evaluating the nature, severity, and intensity of a claimant's symptoms); *Freddette v. Berryhill,* Case No. 17-cv-672-PB, 2019 WL 121249, at *9 (D.N.H. Jan. 7, 2019) (claimant's "daily functioning undermined her claims of fully debilitating symptoms."); *Andrade-Hermort v. Berryhill,* 292 F. Supp. 3d 530, 533-34 (D. Mass. 2018) (the ALJ was justified in relying on the state agency consultants' opinions to evaluate the plaintiff's credibility where none of the plaintiff's treating physicians opined on her limitations). Plaintiff's statements concerning the severity of her pain were further undermined by the evidence that medication, including over-the-counter treatments and bilateral sacroiliac joint injections, relieved her hip and lower back pain after the surgery (A.R. at 23, 1209, 1218, 1292, 1294). *See Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) (concluding that, if an impairment can be controlled through treatment or medication, it cannot be considered disabling); *Avery,* 797 F.2d at 29 (the "[t]ype, dosage, effectiveness, and side effects of any pain medication" and "[t]reatment other than medication for relief of pain" are *Avery* factors); *Rios v.*

*Colvin,* Civil Action No. 3:15-cv-30190-KAR, 2016 WL 7468802, at *14 (D. Mass. Dec. 28,

2016) (plaintiff's report of severe pain was discounted by evidence that medication, including

epidural steroid injections, relieved her pain); *Woods v. Astrue*, Civil Action No. 11-10112-

RWZ, 2012 WL 2126893, at *10 (D. Mass. June 13, 2012) (evidence that plaintiff's pain was

well-controlled on medication supported the ALJ's credibility assessment).[14]

Next, the ALJ had a basis to conclude that Plaintiff exaggerated her need for a cane. Her

testimony at the September 2017 hearing that she had used a cane to walk since 2011 or 2012

and currently needed one or two canes was inconsistent with the records (A.R. at 26, 63). On

August 31, 2015, PA-C Boykin noted that Plaintiff was walking without an assistive device

(A.R. at 562). On her April 4, 2016 function report, Plaintiff indicated that she had used a cane

for "maybe a year or so" and two weeks later, Plaintiff told Dr. Katzen that she had been using a

cane for more than a year (A.R. at 315, 1197). On July 11, 2016, about a month post-surgery,

Plaintiff reported that although she was using a cane to walk, she did not need it (A.R. at 1207).

When Plaintiff visited the Pain Center on December 7, 2016, she was not using a cane (A.R. at

26, 1216). A month later, Plaintiff reported that she could walk for fifteen minutes and could

climb stairs step over step (A.R. at 26, 1213). Plaintiff's gait was normal on January 18 and

February 16, 2017 (A.R. at 1219, 1294). *See Coffman v. Astrue,* 469 F. App'x 609, 610 (9th Cir.

2012) (memorandum) ("The ALJ discounted [plaintiff's] credibility based on inconsistent

---

[14] Plaintiff's representations that she suffered no side effects from medication, which were recounted earlier, were inconsistent with her testimony that her medication made her sick (A.R. at 59, 60, 70). Accordingly, the ALJ had a basis for discrediting that testimony. *See* SSR 16-3p, 2017 WL 5180304, at *8 (in assessing credibility, the ALJ compares "statements an individual makes in connection with the . . . claim for disability benefits with any existing statements she made under other circumstances.").

statements he made to his treatment providers and to the Commissioner."); *Franceschi,* 2013 WL 1285478, at *12.

Finally, as an example of her problems with balance, Plaintiff testified that she lost her balance and dropped her youngest daughter who was ten months old (A.R. at 71). However, this incident occurred before Plaintiff's hip replacement in June 2016; that is, Plaintiff's daughter was born on March 18, 2014 and was ten months old in January 2015 (A.R. at 57, 72, 525, 533).

The ALJ was not required to fully credit Plaintiff's statements regarding the severity of her pain and the extreme limitations on her physical residual functional capacity, which were not supported by the record evidence. *See Augustin v. Berryhill,* 375 F. Supp. 3d 135, 142 (D. Mass. 2019) (resolving conflicts in the evidence is the province of the ALJ, not the courts) (citing *Johnson v. Colvin,* 204 F. Supp. 3d 396, 407 (D. Mass. 2016)). The ALJ's assessment of the severity of Plaintiff's symptoms was supported by substantial evidence.

VI.    CONCLUSION

For the above-stated reasons, Plaintiff's Motion for Reversal of the Commissioner's Decision (Dkt. No. 16) is DENIED and the Commissioner's Motion to Affirm the Decision (Dkt. No. 19) is GRANTED. The case will be closed.

It is so ordered.

Dated: February 25, 2020                         /s/ Katherine A. Robertson
                                                 KATHERINE A. ROBERTSON
                                                 U.S. MAGISTRATE JUDGE